Approved: _____ / _____
ROBERT BOONE/NOAH SOLOWIEJCZYK/EDWARD B. DISKANT/RUSSELL
CAPONE
Assistant United States Attorneys

**ORIGINAL**

Before:    THE HONORABLE JAMES L. COTT
           United States Magistrate Judge
           Southern District of New York

**17 MAG   7118**

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :      <u>SEALED COMPLAINT</u>  DOC #_____
                                  :
     - v. -                       :      Violations of
                                  :      18 U.S.C. §§ 371, 666,
                                  :      1343, 1346, 1349,
                                  :      and 2
                                  :
CHUCK CONNORS PERSON and          :
RASHAN MICHEL,                    :      COUNTY OF OFFENSE:
                                  :      NEW YORK
              Defendants.         :
                                  :
- - - - - - - - - - - - - - - - - x

U.S. DISTRICT COURT
FILED
SEP 25 2017
S.D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JOHN VOURDERIS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

<u>COUNT ONE</u>
(Bribery Conspiracy)

     1.   From at least in or about September 2016, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN
MICHEL, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, to wit, violations of Title 18, United States
Code, Sections 666(a)(1)(B) and 666(a)(2).

     2.   It was a part and object of the conspiracy that CHUCK
CONNORS PERSON, the defendant, being an agent of an
organization, to wit, a public university ("University-1") that
received, in a one-year period, benefits in excess of $10,000
under a Federal program involving a grant, contract, subsidy,

loan, guarantee, insurance, and other form of Federal
assistance, corruptly would and did solicit and demand for the
benefit of a person, and accept and agree to accept, something
of value from a financial advisor and business manager for
professional athletes who, unbeknownst to PERSON, was a
cooperating witness for the Government ("CW-1"), intending to be
influenced and rewarded in connection with a business,
transaction, and series of transactions of such organization,
involving something of value of $5,000 and more, in violation of
Title 18, United States Code, Section 666(a)(1)(B).

3.     It was further a part and object of the conspiracy
that RASHAN MICHEL, the defendant, would and did corruptly give,
offer, and agree to give something of value to a person, namely,
assistant coaches at various National Collegiate Athletic
Association ("NCAA") Division I men's basketball programs,
intending to influence and reward an agent of an organization
that received, in a one-year period, benefits in excess of
$10,000 under a Federal program involving a grant, contract,
subsidy, loan, guarantee, insurance, and other form of Federal
assistance, in connection with a business, transaction, and
series of transactions of such organization, involving something
of value of $5,000 and more, in violation of Title 18, United
States Code, Section 666(a)(2).

OVERT ACTS

4.     In furtherance of the conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,
were committed in the Southern District of New York and
elsewhere:

a.     On or about November 29, 2016, in Alabama, CHUCK
CONNORS PERSON and RASHAN MICHEL, the defendants, and CW-1 met,
during which meeting PERSON agreed to accept approximately
$50,000 in bribe payments from CW-1 in exchange for using his
official position at University-1 to steer student-athletes on
University-1's NCAA Division I men's basketball team to retain
the services of CW-1 and MICHEL.

b.     On or about December 12, 2016, in Manhattan, New
York, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants,
met with CW-1 and a current basketball player for University-1
("Player-1") and together discussed, in sum and substance and in

2

part, that Player-1 would retain the services of MICHEL and CW-1 upon becoming a professional basketball player.

       c.    Immediately after the December 12, 2016 meeting, in Manhattan, New York, PERSON took from CW-1 a $15,000 cash bribe.

       (Title 18, United States Code, Section 371.)

## COUNT TWO
### (Solicitation of Bribes and Gratuities)

    5.    From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON, the defendant, being an agent of an organization, to wit, University-1, that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, with the assistance of RASHAN MICHEL, the defendant, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, PERSON, in his capacity as a coach at University-1, solicited and accepted cash and things of value from CW-1, and in exchange, as brokered by MICHEL, agreed to and did exercise his influence as a coach at University-1 to persuade and pressure student-athletes and their families to retain the services of CW-1.

    (Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT THREE
### (Conspiracy to Commit Honest Services Fraud)

    6.    From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully

and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

7.     It was a part and an object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive University-1 of its intangible right to PERSON's honest services as the associate head coach of its Division I men's basketball program, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, PERSON agreed to and did receive bribe payments, brokered by MICHEL and in the form of wire transfers from CW-1, among other means, and in exchange agreed to and did exercise his influence as a coach at University-1 to persuade and pressure student-athletes and their families to retain the services of CW-1.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
(Honest Services Wire Fraud)

8.     From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON, the defendant, aided and abetted by RASHAN MICHEL, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive University-1 of its intangible right to PERSON's honest services as the associate head coach of its Division I men's basketball program, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, PERSON agreed to and did receive bribe payments, brokered by MICHEL and in the form of wire transfers from CW-1, among other means, and in exchange agreed to and did exercise his influence

4

as a coach at University-1 to persuade and pressure student-athletes and their families to retain the services of CW-1.

(Title 18, United States Code, Sections 1343, 1346, 1349, and 2.)

**COUNT FIVE**
(Conspiracy to Commit Wire Fraud)

9.    From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown,  willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

10.    It was a part and object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown,  willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, PERSON and MICHEL, and others known and unknown, participated in a scheme to defraud, by telephone, email, and wire transfer of funds, among other means and methods, University-1 by facilitating and concealing bribe payments to student-athletes at University-1 and/or their families, thereby causing University-1 to continue to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the bribe payments.

11.    It was a further part and object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire

and radio communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343, to wit, PERSON and MICHEL, and
others known and unknown, participated in a scheme to defraud,
by telephone, email, and wire transfers of funds, among other
means and methods, University-1 by making and concealing bribe
payments to student-athletes at University-1 and/or their
families, which deprived University-1 of its right to control
the use of its assets, including the decision of how to allocate
a limited number of athletic scholarships, and which, if
revealed, would have further exposed University-1 to tangible
economic harm, including monetary and other penalties imposed by
the NCAA.

(Title 18, United States Code, Section 1349.)

## COUNT SIX
(Travel Act Conspiracy)

12.   From at least in or about September 2016, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN
MICHEL, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other to commit an offense against the
United States, to wit, a violation of Title 18, United States
Code, Section 1952.

13.   It was a part and object of the conspiracy that CHUCK
CONNORS PERSON and RASHAN MICHEL, the defendants, and others
known and unknown, willfully and knowingly would and did travel
in interstate commerce, and would and did use and cause to be
used the mail and facilities in interstate and foreign commerce,
with the intent to distribute the proceeds of an unlawful
activity, and to promote, manage, establish, carry on and
facilitate the promotion, management, establishment and carrying
on of an unlawful activity, to wit, as part of MICHEL offering,
and PERSON accepting commercial bribes, in violation of Alabama
Criminal Code §§ 13A-11-120 and 13A-11-121, MICHEL and PERSON
thereafter would and did perform and attempt to perform an act
to distribute the proceeds of said unlawful activity, and to
promote, manage, establish, carry on, and facilitate the
promotion, management, establishment, and carrying on of said

6

unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

## OVERT ACTS

14.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about November 29, 2016, in Alabama, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and CW-1 met, during which meeting PERSON agreed to accept approximately $50,000 in bribe payments from CW-1 in exchange for using his official position at University-1 to steer student-athletes on University-1's NCAA Division I men's basketball team to retain the services of CW-1 and MICHEL.

b.   On or about December 12, 2016, PERSON, MICHEL, and Player-1 traveled to Manhattan, New York and met with CW-1, during which meeting they discussed, in sum and substance and in part, that Player-1 would retain the services of MICHEL and CW-1 upon becoming a professional basketball player.

c.   Immediately after the December 12, 2016 meeting, in Manhattan, New York, PERSON took from CW-1 a $15,000 cash bribe.

(Title 18, United States Code, Section 371.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

15.   I am a Special Agent with the FBI, and I have been personally involved in the investigation of this matter, which has been handled by Special Agents of the FBI and Criminal Investigators in the United States Attorney's Office for the Southern District of New York (the "USAO"). I have been employed by the FBI since 2014. I and other members of the investigative team have experience in fraud and corruption investigations and techniques associated with such investigations, including executing search warrants, financial analysis, wiretaps, and working with informants.

16.   This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation.  Where the contents of documents, including emails, and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## I.   OVERVIEW OF THE INVESTIGATION

17.   The charges in this Complaint result from a scheme involving bribery, corruption, and fraud in intercollegiate athletics.  Since 2015, the FBI and USAO have been investigating the criminal influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the NCAA.  As relevant here, the investigation has revealed numerous instances of bribes paid by athlete advisors, including financial advisors and business managers, among others, to assistant and associate basketball coaches employed by NCAA Division I universities, and sometimes directly to the student-athletes at NCAA Division I universities as facilitated by the coaches, in exchange for those coaches exerting influence over student-athletes under their control to retain the services of the bribe-payors once the athletes enter the National Basketball Association ("NBA").

18.   As the investigation has revealed, by virtue of their official position with federally-funded universities, NCAA Division I men's basketball coaches have the ability to provide sports agents, financial advisors, business managers, and others with access to the student-athletes whom they coach.  Moreover, many such coaches have enormous influence over the student-athletes who play for them, in particular with respect to guiding those student-athletes through the process of selecting agents and other advisors when they prepare to leave college and enter the NBA.  The investigation has revealed several instances in which coaches have exercised that influence by steering players and their families to retain particular advisors, not because of the merits of those advisors, but because the coaches

were being bribed by the advisors to do so.[1]

19.    The corrupt arrangements described herein are valuable both to the assistant and associate coaches, who receive cash bribes to deliver players to an advisor, and to the bribor agents or advisors, for whom securing a future NBA player as a client can prove extremely profitable.  Indeed, based on my review of publicly available information and participation in this investigation, I am aware that certain NBA draft picks can and do make tens of millions of dollars over the course of their NBA career, a portion of which they pay to their agents, and a portion of which they invest and have managed through their financial advisors and business managers, resulting in lucrative fees for those agents and advisors.  As such, as detailed herein, agents and other athlete advisors attempt to recruit student athletes early in their NCAA career, in violation of NCAA rules, including by paying bribes to the athletes' coaches and athletes and/or their families.

20.    This Complaint involves CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants.  As set forth in more detail

---

[1] In addition to the bribery and fraud scheme described herein, the investigation has revealed additional instances of bribe payments to a number of coaches at NCAA Division I universities, as well as a related scheme involving significant cash payments by sports agents, financial advisors, and executives of at least one athletic apparel company to the families of high-school student-athletes, at the request of basketball coaches at two NCAA Division I universities, in exchange for agreements by those athletes to attend the universities and later to sign with the advisors and apparel company who made the bribes.  These additional schemes are detailed in two related Complaints also unsealed today.  *See United States* v. *Lamont Evans, et al.*, 17 Mag. ____, and *United States* v. *James Gatto, et al.*, 17 Mag. ____.  For ease of reference in reading and understanding the three related Complaints, together all universities and players referenced in this Complaint and the two related Complaints have been numbered sequentially, without duplicating defined terms, beginning with University-1 and Player-1 in this Complaint.

herein, PERSON, the associate head coach of the University-1
Division I men's basketball team and a former NBA player and
coach, abused his coaching position at University-1 to solicit
and obtain bribe payments from CW-1 (a financial advisor and
business manager for professional athletes, who, unbeknownst to
PERSON, was providing information to law enforcement and acting
at law enforcement's direction as part of this investigation)[2] in
exchange for PERSON agreeing to direct certain University-1
basketball players to retain the services of CW-1 when those
student-athletes entered the NBA.  The bribe payments initially
were arranged by MICHEL, who had a preexisting relationship with
PERSON and operated a clothing store that specialized in making
bespoke suits for professional athletes.

      21.   In addition, CHUCK CONNORS PERSON, the defendant,
arranged for CW-1 to make payments directly to the families of
the players PERSON was steering to CW-1.  These payments
defrauded University-1 by depriving it of the financial aid
University-1 continued to award to the relevant student-athletes
under false pretenses.  Indeed, for the scheme to succeed and the
financial aid to be awarded, PERSON and the student-athletes
would be required to falsely certify to the universities that
they were unaware of any NCAA rules violations, including the
illegal payments.  The illicit payments to players' families also
defrauded University-1 by interfering with University-1's

---

[2] Based on my participation in the investigation, including my
debriefings of CW-1, I am aware that CW-1 ran a business
management firm that primarily serviced professional athletes,
as well as a registered investment advisory firm that provided
investment related services to CW-1's clients, including
athletes.  Information provided by CW-1 has been corroborated by,
among other things, recorded conversations, electronic
communications, and surveillance by law enforcement.  CW-1 began
cooperating with the Government in or about November 2014.  CW-
1's activities with respect to the defendants described in this
Complaint were conducted at the direction of law enforcement.  In
or about September 2017, CW-1 pleaded guilty to securities
fraud, wire fraud, aggravated identity theft, and making false
statements pursuant to a cooperation agreement with the
Government.  On or about May 6, 2016, CW-1 agreed to settle civil
charges filed by the Securities and Exchange Commission relating
to CW-1's violations of certain securities laws.

ability to control its assets, and creating a risk of tangible
economic harm, including, among other things, decision-making
about the distribution of its limited athletic scholarships; the
possible disgorgement of certain profit-sharing by the NCAA;
monetary fines; restrictions on athlete recruitment and the
distribution of athletic scholarships; and the potential
ineligibility of the university's basketball team to compete in
NCAA programs generally, and the ineligibility of certain
student-athletes in particular.

22.   In total, over a 10-month period, CW-1 paid
approximately $91,500 in bribes to CHUCK CONNORS PERSON, the
defendant, in exchange for PERSON's agreement to use his
official influence over student-athletes at University-1 whom
PERSON believed would enter the NBA to retain CW-1's financial
advisory and business management services and to purchase suits
from MICHEL. As part of the scheme, PERSON claimed to have given
approximately $18,500 of the bribe money he received to the
families of two student-athletes whom PERSON sought to steer to
CW-1.

## II.   BACKGROUND ON THE NCAA AND RELEVANT NCAA RULES

23.   Based on my participation in this investigation, my
review of publicly available information, and my conversations
with other law enforcement agents who have reviewed such
information, I have learned the following:

a.   The NCAA is a non-profit organization
headquartered in Indianapolis, Indiana, that regulates athletics
for over 1,000 colleges and universities, conferences, and other
associations. NCAA member schools are organized into three
separate divisions: Division I, Division II, and Division III.
University-1 is in NCAA's Division I, which is the highest level
of intercollegiate athletics sanctioned by the NCAA.

b.   Division I schools typically have the biggest
student bodies, manage the largest athletics budgets and offer
the most athletic scholarships. Among other things, Division I
schools must offer a minimum amount of financial assistance (in
the form of scholarships) to their athletes; however, the NCAA
sets a maximum number of scholarships available for each sport
that a Division I school cannot exceed. Currently, teams may
offer no more than 13 athletic scholarships for the 2017-2018

11

men's basketball season.

24.    The official rulebook governing Division I schools is the NCAA Division I Manual (the "Manual"), which is published annually and which contains the NCAA Constitution and its operating bylaws (the "Bylaws"). Based on my review of the Manual, I have learned the following, in relevant part:

a.    Among the NCAA's core principles for the conduct of intercollegiate athletics is a directive that "[s]tudent-athletes shall be amateurs in an intercollegiate sport;" and that "student-athletes should be protected from exploitation by professional and commercial enterprises." The Constitution further states that "an institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

b.    Consistent with the NCAA's core principles, any financial assistance to student-athletes other than from the university itself or the athletes' legal guardians is prohibited without express authorization from the NCAA. In addition, neither student-athletes, prospective student athletes, nor their relatives can accept benefits, including money, travel, clothing or other merchandise directly or indirectly from outside sources such as agents[3] or financial advisors. A student-athlete is rendered "ineligible" to participate in Division I sports if the athlete is recruited by a university or any "representative of its athletics interests" in violation of NCAA rules.

c.    Coaches and other team staff at NCAA Division I schools also are subject to various prohibitions, including on (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or

---

[3] The NCAA Division I Bylaws define an "agent" broadly as "any individual who, directly or indirectly, . . . seeks to obtain any type of financial gain or benefit . . . from a student athlete's potential earnings as a professional athlete." Specifically included in the definition of "agent" is, among others, "a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed or associated with such persons."

indirectly from outside sources with respect to any actions
involving the student-athletes.

25.   Based on my review of the NCAA Constitution and its
Bylaws, I have learned that student-athletes, coaches, and staff
members of athletics departments must complete annual
certifications regarding their knowledge of NCAA rules
violations, and, in the case of student-athletes, their
continued eligibility to participate in NCAA-sponsored sports.
In particular:

a.   On an annual basis, a student-athlete must "sign
a statement . . . in which the student-athlete submits
information related to eligibility, recruitment, financial aid,
[and] amateur status," which is known as the "Student-Athlete
Statement."  In the Student-Athlete Statement, the student-
athlete represents, among other things, that "[a]ll information
provided to the NCAA . . . and the institution's admissions
office is accurate and valid, including . . . [his] amateur
status" and that the student-athlete has "reported to [his]
director of athletics . . . any violations of NCAA regulations
involving [him] and [his] institution."  Furthermore, in signing
the Student-Athlete Statement, the Student-Athlete certifies
that "to the best of [his] knowledge, [he] has not violated any
amateurism rules," and has "not provided false or misleading
information concerning [his] amateur status to the NCAA . . . or
the institution's athletics department."

b.   Coaches and staff members must certify annually
that they have reported to their university any knowledge of
violations of NCAA rules involving their institution.

c.   In addition, the Bylaws prohibit student-athletes,
coaches and staff members of athletics departments from
"knowingly furnishing or knowingly influencing others to furnish
the NCAA or the individual's institution false or misleading
information concerning an individual's involvement in or
knowledge of matters relevant to a possible violation of an NCAA
regulation."

26.   As set forth in the Bylaws, violations of NCAA rules
by a university or any individual may lead to penalties
including, but not limited to, limitations on a university's
"participation in postseason play in the involved sport";

13

financial penalties including "requirements that an institution
pay a fine, return revenue received from a specific athletics
event or series of events, or. . . reduction[s] in or
elimination of monetary distribution by" the NCAA; "limitations
on the number of financial aid awards that may be provided" by
the university to student-athletes; and recruiting restrictions
including the ability to conduct off-campus recruiting
activities or to communicate by telephone or letter with
prospective student-athletes.

### III.  RELEVANT INDIVIDUALS AND ENTITIES

### A.  University-1

27.  Based on my review of publicly available information,
I have learned that University-1 is a public research university
located in Alabama.  With approximately 28,000 students and
approximately 1,200 faculty members, it is one of the state's
largest universities.  University-1 fields approximately 19
varsity sports teams in NCAA Division I competition, including
men's basketball.  To date, University-1 has produced at least 29
NBA draft picks, including CHUCK CONNORS PERSON, the defendant.

28.  I know from publicly available information that, in
each year relevant to this Complaint, University-1 received
funds from the federal government in excess of $10,000 per year.

### B.  CHUCK CONNORS PERSON

29.  Based on my review of publicly available information,
I know that CHUCK CONNORS PERSON, the defendant, is the
associate head coach of University-1's Division I men's
basketball program.  PERSON was hired by University-1 as an
assistant coach in or about April 2014, and was promoted to
associate head coach in or about 2015.  From 1982 to 1986, PERSON
played for the NCAA Division I men's basketball team at
University-1.  As a player, PERSON was a two-time All-American
and is the all-time scoring leader in University-1's basketball
history.  Following his collegiate career, PERSON played for
several years in the NBA, and was named the NBA Rookie of the
Year in 1987.  PERSON later worked as an assistant coach for
several NBA teams, including the 2010 NBA Champion Los Angeles
Lakers.

14

## C.   RASHAN MICHEL

30.   Based on my review of publicly available information, and my discussions with CW-1, I have learned that RASHAN MICHEL, the defendant, is the founder and operator of a clothing company (the "Clothing Company") located in Atlanta, Georgia.   The Clothing Company has a client base that consists primarily of professional athletes.  MICHEL has previously worked as both an NBA and college basketball referee.

## IV.   THE CHUCK PERSON SCHEME

### A. *RASHAN MICHEL Meets CW-1 and Begins Arranging for CW-1 to Make Bribe Payments to CHUCK CONNORS PERSON*

31.   In or about 2016, CW-1 was introduced to RASHAN MICHEL, the defendant, through a mutual friend who is a sports agent ("Sports Agent-1").[4]  At the direction of law enforcement, CW-1 had told Sports Agent-1 that CW-1 was willing to pay college coaches who, in exchange, would use their influence over student-athletes to retain CW-1's services as a financial advisor and business manager.  In introducing CW-1 to MICHEL, Sports Agent-1 told CW-1 that, in fact, MICHEL had a connection to a basketball coach at University-1.

32.   In the fall of 2016, CW-1 participated in a series of telephone calls with RASHAN MICHEL, the defendant, in which MICHEL told CW-1 that CHUCK CONNORS PERSON, the defendant, needed money, and in exchange for such money, PERSON would agree

---

[4] Except as otherwise indicated, the bases for my knowledge of the facts described in this Complaint are my participation in this investigation; my training and experience; my discussions with CW-1 and undercover law enforcement agents who participated in the investigation; and my review of the entirety of each recorded telephone call or meeting cited herein, and, where available, a transcript of the call or meeting.  For every instance in which I offer my interpretation of language used during a recorded telephone call or meeting, that interpretation is based on my training, experience, and participation in this investigation, my review of the larger universe of recorded telephone calls and meetings contained herein, and my discussions with CW-1.

to steer student-athletes on University-1's Division I men's basketball team to retain CW-1's financial advisory and business management services, as well as MICHEL's services as a suit maker. As detailed below, MICHEL also later attempted to extract payments from CW-1 in exchange for introducing CW-1 to additional coaches who wished to receive such bribe payments.

33. For example, on or about September 8, 2016, CW-1 and MICHEL spoke on a telephone call that was recorded by CW-1. During the call, MICHEL spoke generally about college basketball coaches who would be willing to accept bribes from CW-1, and specifically about a particular coach at University-1 whom MICHEL knew would agree to do so. In particular, on the call:

a. MICHEL told CW-1 that MICHEL could introduce CW-1 to several college basketball coaches who would accept bribes to steer their athletes to CW-1's services. MICHEL said that "the good thing about it is, I got all the college coaches right now because, guess what, I'm the one that's with them. . . . I make all their suits." MICHEL added that he had "access to the locker room" and "access to the kids and everything," and that "the fucking basketball guys [get] way more money than these fucking football guys. . . . we can get us God damn 10 basketball players in the next 5 years and we gonna . . . have to sit back and do absolutely nothing."

b. MICHEL told CW-1 that he knew a coach at University-1 who needed $60,000 in the form of a loan, and that the coach was going to "have 3 or 4 pros come out a year. . . . [H]e's got one or two of them that's gonna be pretty high draft picks." MICHEL informed CW-1 that, in return for the $60,000 loan, which the coach would pay back over a 24-month period, the coach could "give us 2 or 3 kids that's all coming out of his program."

c. CW-1 told MICHEL that he would agree to provide the University-1 coach with $50,000 (i.e., $10,000 less than the asked-for amount), but that he and MICHEL had to "validate" the University-1 student-athletes being offered by the coach in order to ensure that the athletes in fact were likely to enter the NBA draft such that CW-1 could generate future profits from them. At the conclusion of the call, MICHEL stated that he would set up a meeting with the University-1 coach, and CW-1 indicated that he would discuss MICHEL's proposal with CW-1's financial

16

backers, who would help finance the $50,000 payment.[5]

34.    From in or about September 2016 to in or about
November 2016, RASHAN MICHEL, the defendant, and CW-1 continued
to discuss the purported loan payment to an unnamed basketball
coach at University-1.  Ultimately, MICHEL revealed to CW-1 that
the coach was CHUCK CONNORS PERSON, the defendant, who was the
associate head coach for the NCAA Division I men's basketball
program at University-1.  During this time, MICHEL and CW-1 also
discussed forgiving the purported "loan" by allowing PERSON to
"offset" the amount he owed to CW-1 each time that PERSON
successfully directed a student-athlete to retain CW-1's
services as a financial advisor and business manager, and
MICHEL's services as a clothier.

35.    In or around November 2016, RASHAN MICHEL, the
defendant, and CW-1 began planning a meeting with CHUCK CONNORS
PERSON, the defendant, at University-1 in Alabama.  During
several calls recorded by CW-1, MICHEL and CW-1 continued to
discuss the terms of the bribery scheme, including the
possibility of "offsetting" the loan based on commitments from
student-athletes coached by PERSON.  In particular, the following
discussions occurred, in substance and in part and among others:

a.    On or about November 18, 2016, CW-1 spoke to
MICHEL regarding an upcoming meeting with PERSON.  During the
telephone call, MICHEL emphasized that he wanted CW-1 to arrive
at the meeting with "concrete and solid" terms for the payments
to PERSON "because I don't wanna embarrass myself" in front of
PERSON.  On the call, CW-1 and MICHEL also discussed the
possibility that any loan repayments could be "offset" for each
athlete that committed to retain CW-1, as they had previously
discussed, and MICHEL explained that he and CW-1 had to think
about what the terms of such a deal would be, and "how do you
want to offset it?  You know, let's just say, do we offset it
with clients . . . or do we want to make a monthly payment every
month?"

---

[5] Based on my participation in this investigation, I know that
CW-1 was not, in reality, working with any financial backers and
that CW-1 informed MICHEL that he was working with financial
backers at the direction of law enforcement.

17

b.    On the same call, MICHEL emphasized to CW-1 that
the bribes should be concealed "because [PERSON's] got a chance
of being a head coach and I don't need nothing to come back to
haunt."  To that end, MICHEL suggested that CW-1's financial
backers should "write a check to me and I'll sign the loan
document and . . . hand it over to him, and we'll all be on the
same page. . . . I just don't want nothing to come back screwy."

c.    A few days later, on or about November 22, 2016,
MICHEL and CW-1 spoke again by telephone about how to structure
the purported loan documents.  On the call, MICHEL suggested to
CW-1 that the loan should be for $60,000 (rather than the
$50,000 MICHEL previously had suggested), payable over 36
months, but that if PERSON delivered University-1 basketball
players to CW-1 as clients, then the principal loan
amount would be "offset" by $10,000 to $15,000 per student-
athlete.  Accordingly, MICHEL suggested that if PERSON delivered
enough student-athletes as clients to CW-1 and MICHEL, then they
would owe PERSON money "on the other end" rather than PERSON
owing them money on the loan.

d.    On the November 22 call, MICHEL elaborated on how
they would conceal the true nature of their bribery scheme with
PERSON.  In particular, MICHEL stated that they would reduce the
loan terms to writing in the form of a promissory note, but that
the "only part that won't be in writing is [] that if he
delivers . . . delivers a kid, you know, what we willing to do
for him."  MICHEL advised that, by reducing the loan to writing,
they would make the transaction appear "the right way" and
"clean," so that "it don't hurt nobody."  MICHEL further noted
that the bribes could be justified as a loan because "it's not
that you giving me a check to make sure I deliver any kid, you
going to get that because you being around and you got that
access to do that," but that the unwritten terms of the loan
would be "understood" among the parties because "why would I
give [PERSON] the money if that's not understood?  I don't need
to put 50,000 thousand dollars out just to be, to put it out and
make 10%. I can do that anyway."

d.    The next day, on or about November 23, 2016, CW-1
spoke to MICHEL.  CW-1 and MICHEL agreed that CW-1 would give
PERSON an initial payment of $5,000 at the time that PERSON
signed the promissory note.

18

### B. *The November 29, 2016 Meeting: MICHEL and CW-1 Meet PERSON and Discuss the Terms of the Bribe Payment*

36.    On or about November 29, 2016, at the direction of law enforcement, CW-1 met with CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, at a restaurant located in the vicinity of University-1's campus (the "November 29th Meeting").[6]  During the meeting, which was recorded on video and audio by CW-1 and surveilled by FBI agents, PERSON agreed to accept $50,000 in bribe payments from CW-1 in exchange for using his official position at University-1 to steer student-athletes on University-1's basketball team to CW-1's firm.  Specifically, at the meeting, the following transpired, in substance and in part:

a.    PERSON told CW-1 that there would be a new member of the University-1 men's basketball team in approximately January who was the "9th ranked kid in the country" in basketball.  PERSON noted that "nobody knows" that the athlete would begin playing for University-1 in January.  PERSON added that this particular athlete would "play a year and a half" of collegiate sports prior to joining the NBA draft "because he can't leave this year because he has to play a full college season."  MICHEL told PERSON that, with respect to this player, "we want to try to get involved with him now, as soon as possible," to which PERSON responded that the athlete's mother would be "handling" the relationship with any advisors.  MICHEL then inquired of PERSON whether the athlete and his mother had "started making decision[s] on anything yet?," and PERSON confirmed that they had not yet chosen any advisors.

b.    MICHEL then proceeded to explain to PERSON the general parameters of the purported loan that PERSON would receive, and confirmed that PERSON would be given an initial bribe payment of $5,000 that day ("alright we'll give you five today"), which CW-1 had brought with him in cash.  MICHEL further explained that PERSON would receive three additional payments of $15,000 on the 15th of each month.

_____

[6] In advance of the meeting, a law enforcement agent provided CW-1 with an envelope containing $5,000 in cash, intended as an initial payment on the $50,000 bribe that, based on the foregoing, CW-1 expected PERSON to ask for.

c.    PERSON, MICHEL and CW-1 discussed how the
purported loan payments would be "offset" by the student-
athletes that PERSON steered to them, to which PERSON responded,
"so we make this go away. . . quickly?" MICHEL elaborated on the
proposal, noting that "what we gonna do is, every time you send
me a kid, I'm gonna offset some of that money I gave you. . . .
You good with that?" PERSON confirmed to MICHEL and CW-1 that he
was "good with it." PERSON then signed the promissory note that
CW-1 had prepared and brought to the meeting, which listed the
repayment terms for the loan, but which omitted any mention of
PERSON's agreement to use his influence over University-1
basketball players to steer them to CW-1 and MICHEL's services.

d.    After signing the promissory note, PERSON asked
if CW-1 could pay him $10,000 that day, rather than the agreed-
upon $5,000 initial payment. CW-1 agreed to wire an additional
$5,000 to PERSON, and CW-1 and PERSON made a handwritten
revision to the promissory note reflecting that the initial
payment to PERSON would be $10,000 rather than $5,000.

37.   Based on my discussions with law enforcement agents
regarding their debriefings of CW-1 and surveillance in the
vicinity of the November 29 Meeting, I know that prior to the
meeting, CW-1 had provided the envelope containing $5,000 in
cash to RASHAN MICHEL, the defendant. At the end of the meeting,
MICHEL and CHUCK CONNORS PERSON, the defendant, left the
restaurant together, while CW-1 remained behind. MICHEL and
PERSON then entered PERSON's vehicle and briefly drove around
the parking lot of the restaurant. MICHEL then exited PERSON's
vehicle and met CW-1 outside of the restaurant. I believe that
during MICHEL and PERSON's drive around the parking lot, MICHEL
provided PERSON the envelope containing the $5,000 in cash.

## C. PERSON Accepts Additional Payments from CW-1 While
## Arranging for CW-1 to Meet Player-1 and Mother-1

38.   One day after the November 29 Meeting, CHUCK CONNORS
PERSON, the defendant, sent a text message to CW-1, asking CW-1
to call him. Minutes later, RASHAN MICHEL, the defendant, sent
CW-1 a text message that contained information needed to wire
money to PERSON, including PERSON's bank account number, the
routing number for his bank, and his address. I have reviewed
each of these text messages. Later that day, CW-1 spoke to
PERSON on a telephone call that was recorded by CW-1. During the

20

call, PERSON touted a specific player ("Player-1") that PERSON wanted to steer to CW-1, and told CW-1 that Player-1 was likely to enter the NBA draft following the current season.  PERSON also discussed setting up a meeting between CW-1 and Player-1's mother ("Mother-1").  PERSON informed CW-1 that he met with Player-1 every week at Mother-1's house, and that Player-1 "listens to one person. He listens to one person . . . That's me, yep."  PERSON informed CW-1 that University-1's men's basketball team would be playing a game in New York City in a few weeks, and suggested that CW-1 meet with Mother-1 after the game.  PERSON also asked CW-1 to confirm that he would be receiving the next installment of the bribe payment on the agreed-upon schedule, asking "you're gonna – you're gonna give me 10 today, and then 15, 15, 10, correct?"

    39.  On or about December 1, 2016, CW-1 exchanged text messages with CHUCK CONNORS PERSON, the defendant, regarding a wire transfer of the additional $5,000 payment that CW-1 had agreed to send to PERSON at the November 29 Meeting.  Below is a screen shot of the text message exchange between CW-1 and PERSON, with CW-1's texts on the right and text messages sent from PERSON's phone number on the left.  The exchange included the following, in substance and in part:



40.   That same day, December 1, 2016, CW-1 spoke to CHUCK CONNORS PERSON, the defendant, on a telephone call recorded by CW-1.  During the call, CW-1 informed PERSON that he had sent the wire transfer to PERSON as previously discussed, and proposed that at their next meeting in New York City, CW-1 could provide PERSON with another $5,000.  PERSON responded, "Ok, that'll be great," and then stated that he would arrange for Player-1 and another player to meet with CW-1.

41.   On or about December 2, 2016, CW-1 spoke to CHUCK CONNORS PERSON, the defendant, by telephone.  During the call, which was recorded by CW-1, PERSON explained to CW-1 the logistics of meeting Player-1 and Mother-1, and informed CW-1 that Mother-1 also expected to receive money from CW-1.  PERSON further explained that CW-1 should not explicitly reference their scheme in written text messages with PERSON.  In

22

particular, the following was discussed, in substance and in part:

a.     PERSON confirmed that CW-1 would meet Player-1 (rather than Mother-1) during the upcoming trip by University-1's men's basketball team to New York City, and that CW-1 would meet Mother-1 a few days later at PERSON's house in Alabama.

b.     PERSON also discussed receiving future bribe payments, and then suggested that Mother-1 would also expect to be paid by CW-1 in exchange for influencing her son to retain CW-1 as a financial advisor and business manager.  PERSON told CW-1 that, although he would "make a quick introduction" between CW-1 and Player-1 in New York City "just so he'll know who you are and see your face," "everything will go through his mom." PERSON then cautioned CW-1 that "when we text, you know, don't text anything personal or about [Player-1], obviously. . . . if anything needs to be, just, we'll just speak it over the phone," and CW-1 agreed.

c.     On the call, PERSON also sought to impress CW-1 with the quality of University-1's basketball players, stating that "I got some great great, I mean, great great ball players. [University-1]'s never seen these players since, um, Charles Barkley, myself, and Chris Morris.  This is unbelievable. . . . I got a kid, he's ranked 9th in the country."  PERSON noted that, "I'd like to get these players to, uh, get to you, and then if, if I can supplement myself and be able to stay at [University-1], and make it work, then I can stay and not go looking somewhere else. . . . Then that'll be good – that'll be good for both of us."  In response to a question from CW-1 about how much PERSON was admired by the student-athletes on the basketball team at University-1, PERSON confirmed, "yeah, really, when you've coached Kobe Bryant, worked with Phil Jackson, it goes a long ways."

### D. *PERSON Introduces Player-1 to MICHEL and CW-1*

42.     On or about December 12, 2016, at a hotel in Manhattan, New York, CW-1, at the direction of law enforcement, met with CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and Player-1, who is a current member of the NCAA Division I men's basketball team at University-1.  The University-1 men's basketball team was in New York City that day to play a

basketball game at Madison Square Garden. During the meeting, which was recorded by CW-1 at the direction of law enforcement, including by video, the following occurred, in substance and in part:

      a.   PERSON, with Player-1 in the room, informed CW-1 that he had told Player-1 and Mother-1 that CW-1 was a financial advisor, and then asked CW-1 to tell Player-1 "a little about yourself." CW-1 then told Player-1 that he would meet with Mother-1 later, but that he wanted to "make sure you [have] a face to put with the voice and the name or whatever so ya know so when we do get together . . . you're good with everything." PERSON then explained that CW-1 would get Player-1 a separate telephone so they could communicate, to which Player-1 replied "cool."

      b.   PERSON then informed Player-1 that he and CW-1 would "sit down with your mom and we'll come up with something. We can help you out." Confirming that Player-1 was guided largely by PERSON, Player-1 told CW-1, with respect to PERSON, that "whatever he good with, I'm [] with, I trust him 100%." PERSON then suggested that he and CW-1 would "figure out something to give [Player-1] every month."

      c.   During the meeting, PERSON cautioned Player-1 that the "most important part is that you . . . don't say nothing to anybody, don't discuss that you know with your sisters . . . just you and your mom and [your stepfather], if you want to, that's that's you and your mom's decision if you want [your stepfather] to know . . . but don't share with your sisters, don't share with any of the teammates, that's very important cause this is a violation . . . of rules, but this is how the NBA players get it done, they get early relationships, and they form partnerships, they form trust, you get to know [CW-1], you get to know Rashan [MICHEL] a lot and like Rashan can get you suits and stuff . . . you'll start looking like an NBA ball player, that's what you are." PERSON further explained to Player-1 that, although Player-1 would be receiving some payments, "your personality and the way you do things can't change. Don't flaunt the stuff you get and, you know, don't change the way you speak to people, that's very important too,

[and] character. . .which we talk about all the time."[7]

      d.   During the December 12 meeting, outside of the presence of Player-1, CW-1 gave PERSON approximately $15,000 in cash at the direction of law enforcement.

### E. PERSON Introduces CW-1 to Mother-1, and Encourages Mother-1 to Take Money from CW-1

43.   I know from my participation in the investigation, and from telephone calls intercepted pursuant to a judicially authorized wiretap of a cellphone used by CHUCK CONNORS PERSON, the defendant (the "Person Wiretap"), that after receiving bribe payments from CW-1 and using his official position as the associate head coach at University-1 to influence Player-1 to retain the services of CW-1, PERSON began exerting additional pressure on Mother-1, Player-1's mother, for the same purpose. I also know, based on my discussions with CW-1 and review of the recordings discussed herein, that at no point did PERSON ask CW-1 about CW-1's qualifications as a financial advisor and business manager, CW-1's client base, CW-1's history of successfully managing players' money, or anything else about CW-1's business. Had PERSON done any diligence, he would have learned that by May 2016, news regarding allegations of securities fraud against CW-1 by the SEC were publicly available via simple internet searches of CW-1's name. Nonetheless, as noted below, in exchange for bribes, PERSON persisted in urging Mother-1, and later the mother of another player, to retain CW-1's services for their sons, and in so doing vouched for CW-1's ability and trustworthiness.

44.   Specifically, based on a telephone conversation intercepted on or about December 17, 2016, pursuant to the Person Wiretap, I have learned the following:

      a.   PERSON told Mother-1 that "[Player-1] is going to be good enough to go first round.  I've talked to a bunch of

---

[7] Throughout the course of the investigation described herein, CW-1 never provided payments directly to Player-1. As noted herein, CW-1 did provide payments to Mother-1, as facilitated by PERSON.

people. . . . And I want him to leave" to play in the NBA.
PERSON then told Mother-1 that he had "an investor, a financial
guy I work with and I want you to meet with him on . . . Sunday
at my house after the game, about 4 o'clock."  PERSON explained
to Mother-1 that the "financial guy" could start "helping you
guys out.  And with whatever you want.  And, um, he won't be his
agent. He'll just, he'll just be a financial advisor."

     b.    PERSON then told Mother-1 that "I trust him,"
referencing CW-1, and lied to Mother-1 in at least three ways to
pressure and influence Mother-1 into retaining CW-1.  First,
PERSON told Mother-1 that CW-1 was a financial advisor to
PERSON, which I know from CW-1 to be false.  Second, PERSON told
Mother-1 that CW-1 was an advisor to Charles Barkley, an NBA
Hall of Fame inductee that previously attended University-1,
which I also know from CW-1 to be false.  Finally, PERSON
falsely claimed to Mother-1 that PERSON was not "getting
anything" for connecting CW-1 with Player-1.

     c.    PERSON told Mother-1, regarding CW-1, to "sit
down with him and . . . he'll start giving you guys . . . 5
[thousand dollars] or so a month . . . . So that way, you don't
have to worry about anything."  PERSON added that "if we do
this, can't nobody ever know . . . . Just you, and [Player'1's
stepfather], me and [Player-1].  That's it."

     d.    PERSON elaborated that Mother-1 should come to
PERSON's house after University-1's basketball game on December
18, 2016 in order to meet with CW-1, telling her that CW-1 would
"bring you guys some money, and then he's gonna leave."  PERSON
further informed Mother-1 that CW-1 would get her "a separate
phone if you want one for y'all to talk to and stuff like that
on," and that "whatever you need, he'll give it to you."  PERSON
reiterated that "nobody should ever know" about Player-1's
involvement with CW-1.

    45.    On or about December 18, 2016, at the direction of law
enforcement, CW-1 met with CHUCK CONNORS PERSON, the defendant,
Mother-1, and an unidentified male whom I believe to be Player-
1's stepfather ("Stepfather-1"), at a house believed to be owned
by PERSON in Alabama.  The meeting was recorded by CW-1,
including by video.  During the meeting, PERSON introduced CW-1
to Mother-1, and discussed with Mother-1, in sum and substance,
CW-1 becoming Player-1's financial advisor.  PERSON told Mother-1

and Stepfather-1 that Player-1 had already met with CW-1 in New York.  PERSON assured Mother-1 and Stepfather-1 that they did not "have to sign anything, your word is good enough for him, and your word is good enough for me," and further explained that "when [Player-1] get[s] drafted in June then they'll make a formal signing to be a financial advisor, now he is not an agent, so he can't do any contracts, so when [Player-1] starts getting paid and . . . what percentage of money you're going to send to [CW-1] for him to invest is going to be up to you guys uh but [Player-1] should invest a large portion if not all of it, and uh you shouldn't work with more than one financial agent."

46.  At the December 18 meeting, CHUCK CONNORS PERSON, the defendant, brought up the topic of payments, and told Mother-1 and Stepfather-1 that CW-1 would pay them "a few," over the next four months, which was the remainder of the basketball season. Based on my participation in this investigation, including my discussions with CW-1, I believe that PERSON's remark that CW-1 would pay Player-1's relatives "a few" meant that he would pay them a few thousand dollars per month.  PERSON also told Mother-1 and Stepfather-1 that CW-1 would pay them $1,000 in cash that day, which payment CW-1 provided at the meeting.[8]

### F. PERSON tells CW-1 that Player-1 Will Be Entering the NBA Draft; CW-1 Makes Additional Payments to PERSON and MICHEL

47.  On or about December 27, 2016, CW-1, at the direction of law enforcement, sent a wire transfer of $10,000 provided by the FBI to a bank account belonging to CHUCK CONNORS PERSON, the defendant.

_____

[8] Based on my participation in this investigation, I believe that Player-1 receives an athletic scholarship from University-1.  I am further aware, as described above, that both Player-1 and PERSON must make annual certifications to University-1 regarding their participation in or knowledge of NCAA rules violations, and that violations involving the receipt of money can render scholarship recipients such as Player-1 ineligible to play NCAA-sponsored basketball, among other things.

48.   On or about January 10, 2017, CHUCK CONNORS PERSON, the defendant, spoke by telephone to CW-1.  During the call, PERSON informed CW-1 that he had received confirmation that day that it was "a hundred percent that [Player—1] is leaving" to join the NBA draft, and that the "Brooklyn Nets said whatever [draft] pick they get" unless it was too high a pick, they would take Player-1.[9]  PERSON then asked CW-1 not to tell RASHAN MICHEL, the defendant, that Player-1 would be declaring for the NBA because "we are beyond him now.  I mean obviously I appreciate him, you know, him getting you to me and making this thing work."  PERSON stated that he had paid MICHEL money out of the bribe payments he had received from CW-1, but that he felt MICHEL was trying to "double dip."

49.   Two days later, on or about January 12, 2017, CW-1 sent a wire transfer of $11,500 provided by the FBI to the account of CHUCK CONNORS PERSON, the defendant.  The wire transfers made to PERSON were made at the direction of the FBI, using wiring instructions that previously had been provided by RASHAN MICHEL, the defendant.

### G. PERSON Attempts to Steer Mother-2 and Player-2 to Another Financial Advisor, and Ultimately to CW-1, Including Through an In-Person Meeting and Payments to Mother-2

50.   Based on my participation in this investigation, including my review of recorded telephone calls over the Person Wiretap, I know that at least as early as in or about January 2017, CHUCK CONNORS PERSON, the defendant, began discussing with another financial advisor located in Alabama ("Advisor-1") facilitating a meeting between Advisor-1 and the mother ("Mother-2") of another University-1 basketball player ("Player-2"), and that a meeting ultimately did occur involving PERSON, Advisor-1, an associate of Advisor-1, and Mother-2.  I believe that PERSON's purpose in arranging a meeting between Advisor-1 and Mother-2 was to engage in a scheme similar to the one described above involving Player-1 and Mother-1.  In other words, PERSON was hoping to be compensated by Advisor-1 for directing Player-2, through Mother-2, to retain the services of Advisor-1

---

[9] Based on publicly available information, I am aware that Player-1 ultimately did not declare for the 2017 NBA Draft and still plays for University-1.

when Player-2 became a professional athlete.

51.    Based on my participation in this investigation, including my review of recorded telephone calls involving CHUCK CONNORS PERSON, the defendant, I further believe that PERSON initially intended for Advisor-1 and CW-1 to jointly represent Player-2, so that PERSON could receive money from both individuals in exchange for directing Player-2 to retain their services.  In particular, on or about January 18, 2017, at the direction of law enforcement, CW-1 met with PERSON, Mother-2, and Player-2, at a house believed to be owned by PERSON in Alabama.  During the meeting, which was recorded on video and audio by CW-1, the following occurred, in substance and in part:

a.    PERSON introduced CW-1 to Mother-2 and Player-2. CW-1, PERSON, and Mother-2 then discussed, among other things, that CW-1 and Advisor-1 would become Player-2's business manager and financial advisor when Player-2 entered the NBA.  At the meeting, PERSON stated that the type of money that Player-2 would make in the NBA would be "unreal."  PERSON informed Mother-2 and Player-2 that, once he made the connection among CW-1, Advisor-1, Player-2 and Mother-2, he would be "out of it.  That's between [you], your business, what you're doing and how much you need help going forward with what you need."

b.    At the meeting, outside of the presence of Mother-2 and Player-2, CW-1 provided PERSON with a payment of $10,000 in cash.

52.    The next day, January 19, 2017, CHUCK CONNORS PERSON, the defendant, and Advisor-1 spoke on the telephone on a call intercepted over the Person Wiretap.  On the call, Advisor-1 informed PERSON that he did not want to make payments to Mother-2 to ensure that Player-2 would retain Advisor-1's services, in part, because such payments were "never going to be enough" and he "won't be able to stop."

53.    After Advisor-1 decided not to make payments to ensure that Player-2 retained Advisor-1 as a financial advisor, CHUCK CONNORS PERSON, the defendant, encouraged Mother-2 to develop a financial relationship exclusively with CW-1.  In particular, on or about January 23, 2017, PERSON and Mother-2 spoke on a telephone call that was intercepted over the Person Wiretap. During the call, PERSON and Mother-2 had the following

discussion, in sum and substance and in part:

a.    PERSON told Mother-2 that, instead of using both Advisor-1 and CW-1, they should "just go and use [CW-1]."  When Mother-2 questioned PERSON about cutting out Advisor-1, PERSON clarified that he was only "talking about just for what you need monthly. . . . Just use [CW-1] until [Player-2] leaves school."

b.    Mother-2 confirmed with PERSON that CW-1 could provide Mother-2 with payments "right now," and inquired if accepting payments would mean that "I'm committing to going with him . . . right?," which PERSON stated was true.  PERSON further told Mother-2 that she should tell CW-1 what she needed, and that, because CW-1 was not an "agent," the payments were not "illegal," but that, nevertheless, Mother-2 should keep the relationship quiet.  Mother-2 expressed her gratitude to PERSON for "putting the right people around us."  At no time during this call did PERSON inform Mother-2 of his personal receipt of cash payments from CW-1 in exchange for steering Mother-2 and her son to CW-1.

## H. MICHEL Seeks Money From CW-1, and Introduces CW-1 to a Member of the Athletics Department at Another University Who Is Willing to Take Bribes

54.    Based on my participation in this investigation, including my review of recorded telephone calls and in-person meetings involving RASHAN MICHEL, the defendant, I know that MICHEL solicited payments from CW-1 in exchange for introducing CW-1 to basketball coaches at NCAA Division I universities other than CHUCK CONNORS PERSON, the defendant, interested in accepting bribe payments from CW-1 in exchange for directing certain of their players to retain CW-1's services.  In particular, on or about January 5, 2017, MICHEL and CW-1 met at a restaurant in Atlanta, Georgia and discussed, among other things, MICHEL's proposal that CW-1 pay him on a monthly basis going forward.  This meeting was recorded on video and audio by CW-1.  At the meeting, MICHEL explained to CW-1 that he wanted to receive payments in exchange for which MICHEL would introduce CW-1 to additional college coaches who wished to accept bribes from CW-1.

55.    From at least in or about January 2017 through in or about September 2017, RASHAN MICHEL, the defendant, in exchange

30

for tens of thousands of dollars in payments, made efforts to recruit additional college basketball coaches into the bribery scheme, including facilitating the payment of approximately $25,000 from CW-1 and an undercover law enforcement agent posing as CW-1's business partner ("UC-1") to a member of the athletics department of a NCAA Division I basketball program ("Staff Member-1"). In particular, I know that the following transpired:

        a.    On or around May 3, 2017, MICHEL arranged a meeting that involved MICHEL, Staff Member-1 and CW-1. During the meeting, which CW-1 recorded, CW-1 made a $5,000 payment to Staff Member-1 and a $2,000 payment to MICHEL. At that meeting, CW-1 asked Staff Member-1, in substance and in part, whether Staff Member-1 had the ability to influence college basketball players at Staff Member-1's university to retain CW-1. Staff Member-1 told CW-1, among other things, that "if access and relationships and leading to where you need to be and, you know, helping with that . . . yeah, I can absolutely do that. . . . but at the same time . . . I have to be very conscious of all things that I do touch, not to put me in certain things and be in a position where we jeopardize that as well, because the moment that happens, there's no access."

        b.    On or July 24, 2017, MICHEL met with CW-1 and UC-1 in Manhattan, New York. At the meeting, which CW-1 recorded, UC-1 provided MICHEL with $10,000 intended for Staff Member-1, and also paid MICHEL $12,500 for his continued recruitment of Staff Member-1 and others to receive bribes in exchange for directing players to CW-1 and UC-1.

        c.    On or around August 31, 2017, MICHEL arranged a meeting at a restaurant in Atlanta, Georgia that involved MICHEL, Staff Member-1, CW-1, and the father of a highly regarded incoming freshman basketball player at Staff Member-1's university ("Father-1"). The meeting was recorded on audio and video by CW-1. The purpose of the meeting was for Staff Member-1 to introduce Father-1 to CW-1, as part of an effort to steer Father-1's son to retain CW-1's services. During the meeting, MICHEL texted CW-1 that he and CW-1 should leave the table and go to the bathroom, so that Staff Member-1 could speak to Father-1 about retaining CW-1. Once inside the restaurant bathroom, CW-1 gave MICHEL approximately $10,000 in cash to give to Staff Member-1.

31

### G. *Total Payments To CHUCK CONNORS PERSON and RASHAN MICHEL*

56. During the course of the charged scheme, CHUCK CONNORS PERSON, the defendant, received approximately $91,500 from CW-1 for directing Player-1 and Player-2 to retain the services of CW-1 and RASHAN MICHEL, the defendant, and also for agreeing to contact a coaching colleague of his at another NCAA Division I university whom PERSON believed would be interested in accepting bribes from CW-1. Of the total amount he received, PERSON claimed to CW-1 to have given approximately $18,500 to the families of Player-1 and Player-2 to encourage them further to retain the services of CW-1. Specifically, PERSON claimed to have given approximately $11,000 to Mother-1 and approximately $7,500 to Mother-2.

57. During the course of the charged scheme, RASHAN MICHEL, the defendant, received approximately $49,000 from CW-1 to cover travel expenses related to his participation in the scheme and for MICHEL's proposal to bribe, and efforts at bribing, other coaches. MICHEL claimed to have given approximately $20,000 of that amount to Staff Member-1 and approximately $5,000 of that amount to Mother-2.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and that they be imprisoned or bailed, as the case may be.

JOHN VOURDERIS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25th day of September, 2017

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK