JUDGE PRESKA

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

              - v. -                     :         **INDICTMENT**

CHUCK CONNORS PERSON, and                :         17 Cr.
RASHAN MICHEL,
                                         :
              Defendants.

- - - - - - - - - - - - - - - - - - x

**17 CRIM    683**

### Overview

1.    The charges in this Indictment relate to the criminal influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the National Collegiate Athletic Association (the "NCAA").    As described further below, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, among others, participated in a scheme whereby bribes were solicited from and paid by a financial advisor and business manager to PERSON, a coach for an NCAA Division I men's basketball program at Auburn University, and such bribe payments were facilitated by MICHEL.    In exchange for the bribes, PERSON agreed to exert, and did exert, his influence over student-athletes under his control to retain the services of the bribe-payors once the athletes eventually entered the National Basketball Association ("NBA").

2.    At all times relevant to this Indictment, CHUCK CONNORS PERSON, the defendant, by virtue of his official position as an NCAA Division I men's basketball coach, had the ability to provide

sports agents, financial advisors, business managers and others with access to the student-athletes whom he coached. Moreover, PERSON had substantial influence over the student-athletes who played for him, including with respect to guiding those student-athletes through the process of selecting agents and other advisors when they prepared to leave college and enter the NBA. PERSON exercised that influence by agreeing to steer and/or steering athletes and their families to retain a particular advisor, not because of the merits of that advisor, but because PERSON was being bribed by the advisor to do so.

3. The corrupt arrangements described in this Indictment were valuable both to CHUCK CONNORS PERSON, the defendant, who received cash bribes to deliver athletes to an agent or advisor, and to the bribor agents or advisors, for whom securing a future NBA player as a client could prove extremely profitable. As the scheme participants knew, NBA draft picks can make tens of millions of dollars over the course of their NBA career, a portion of which they typically pay to their agents, and a portion of which they invest and have managed typically through financial advisors and business managers, resulting in lucrative fees for those agents and advisors.

4. In addition, CHUCK CONNORS PERSON, the defendant; directed payments to certain student-athletes and/or their family

members, which payments PERSON knew would be concealed on certifications submitted by these student-athletes to Auburn University, as well as in the certifications submitted by PERSON to Auburn University. These payments defrauded Auburn University by depriving it of the financial aid Auburn University continued to award to the relevant student-athletes under false pretenses. The illicit payments to athletes' families also defrauded Auburn University by interfering with Auburn University's ability to control its assets, and creating a risk of tangible economic harm, including, among other things, decision-making about the distribution of its limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; the potential ineligibility of the university's basketball team to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

**Relevant Entity**

5.    At all relevant times, Auburn University was a public university located in Alabama that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year. At all relevant times, Auburn University fielded multiple varsity sports teams in NCAA Division I

3

competition, including men's basketball.

## The Defendants and Relevant Individuals

6.     From in or about April 2014 through in or about 2015, CHUCK CONNORS PERSON, the defendant, served as an assistant coach for the NCAA Division I men's basketball program at Auburn University.     In or about 2015, PERSON was promoted by Auburn University to associate head coach for its Division I men's basketball program and remained in that position at all times relevant to this Indictment.

7.     At all relevant times, RASHAN MICHEL, the defendant, was the founder and operator of a clothing company located in Atlanta, Georgia, which had a client base that consisted primarily of professional athletes.

8.     "CW-1", as referred to herein, is an individual who ran a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including athletes.   CW-1's activities described in this Indictment were undertaken during the course of his cooperation and at the instruction of law enforcement.

## Background on the NCAA and Relevant NCAA Rules

9.     The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, which regulates athletics for over 1,000

4

colleges and universities, conferences, and other associations.
NCAA member schools are organized into three separate Divisions:
Division I, Division II, and Division III.  Auburn University is
in NCAA's Division I, which is the highest level of intercollegiate
athletics sanctioned by the NCAA.

10.  Division I schools typically have the biggest student
bodies, manage the largest athletics budgets and offer the most
athletic scholarships.  Among other things, Division I schools
must offer a minimum amount of financial assistance (in the form
of scholarships) to their athletes; however, at all times relevant
to the Indictment, the NCAA set a maximum number of scholarships
available for each sport that a Division I school could not exceed.
Teams could offer no more than 13 athletic scholarships for the
2017-2018 men's basketball season.

11.  At all times relevant to the Indictment, the official
rulebook governing Division I schools was the NCAA Division I
Manual (the "Manual"), which is published annually and which
contains the NCAA Constitution and its operating bylaws (the
"Bylaws").  Among the NCAA's core principles for the conduct of
intercollegiate athletics was a directive that "[s]tudent-athletes
shall be amateurs in an intercollegiate sport" and that "student-
athletes should be protected from exploitation by professional and
commercial enterprises."  The Constitution further stated that "an

5

institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

12. Consistent with the NCAA's core principles, any financial assistance to student-athletes other than from the university itself or the athletes' legal guardians was prohibited without express authorization from the NCAA. In addition, neither student-athletes, prospective student-athletes, nor their relatives could accept benefits, including money, travel, clothing or other merchandise directly or indirectly from outside sources such as agents or financial advisors.

13. At all relevant times, the NCAA Division I Bylaws defined an "agent" broadly as "any individual who, directly or indirectly, . . . seeks to obtain any type of financial gain or benefit . . . from a student-athlete's potential earnings as a professional athlete." Specifically included in the definition of "agent" was, among others, "a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed or associated with such persons."

14. At all relevant times, a student-athlete was rendered "ineligible" to participate in Division I sports if the athlete was recruited by a university or any "representative of its athletics interests" in violation of NCAA rules.

6

15. At all relevant times, coaches and other team staff at NCAA Division I schools also were subject to various prohibitions, including on (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes.

16. At all relevant times, student-athletes, coaches, and staff members of university athletics departments were required to complete annual certifications regarding their knowledge of NCAA rules violations, and, in the case of student-athletes, their continued eligibility to participate in NCAA-sponsored sports.

17. At all relevant times, a student-athlete was required to, on an annual basis, "sign a statement . . . in which the student-athlete submits information related to eligibility, recruitment, financial aid, [and] amateur status," which is known as the "Student-Athlete Statement." In the Student-Athlete Statement, the student-athlete represented, among other things, that "[a]ll information provided to the NCAA . . . and the institution's admissions office is accurate and valid, including . . . [his] amateur status" and that the student-athlete had "reported to [his] director of athletics . . . any violations of NCAA regulations involving [him] and [his] institution." Furthermore, in signing the Student-Athlete Statement, the

7

student-athlete certified that "to the best of [his] knowledge, [he] ha[d] not violated any amateurism rules," and had "not provided false or misleading information concerning [his] amateur status to the NCAA . . . or the institution's athletics department."

18. At all relevant times, coaches and staff members were required to certify annually that they had reported to their university any knowledge of violations of NCAA rules involving their institution.

19. In addition, at all relevant times, the Bylaws prohibited student-athletes, coaches and staff members of athletics departments from "knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation."

20. As set forth in the Bylaws, violations of NCAA rules by a university or any individual may lead to penalties including, but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary

8

distribution by" the NCAA; "limitations on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

## THE CHUCK PERSON BRIBERY SCHEME

21. Beginning in 2016, and continuing into in or about September 2017, CHUCK CONNORS PERSON, the defendant, solicited and accepted at least $91,500 in bribes from, among others, CW-1, and in exchange agreed to exert his official influence over certain student-athletes that PERSON coached at Auburn University, so that the athletes would retain CW-1's business management services when they entered the NBA, as well as the services of RASHAN MICHEL, the defendant, as a suit maker. In addition, PERSON facilitated payments to the families of the athletes PERSON was steering to CW-1. MICHEL, who had a preexisting relationship with PERSON, brokered the arrangement between PERSON and CW-1, and also solicited and received for himself tens of thousands of dollars in payments from CW-1 in exchange for introducing CW-1 to PERSON, and for promising to introduce CW-1 to other basketball coaches at NCAA Division I universities who were interested in accepting bribe payments from CW-1 in exchange for directing certain of their athletes to retain CW-1's services.

9

**MICHEL Meets CW-1 and Begins Arranging for CW-1 to Make Bribe Payments to PERSON**

22. In or about 2016, CW-1 was introduced to RASHAN MICHEL, the defendant, through a mutual friend who had been told by CW-1 that CW-1 was willing to pay college coaches to use their influence over student-athletes to retain CW-1's services as a financial advisor and business manager. Through the introduction, CW-1 learned that MICHEL had a connection to a basketball coach at Auburn University, whom MICHEL ultimately revealed to be CHUCK CONNORS PERSON, the defendant.

23. From in or about September 2016 to in or about November 2016, RASHAN MICHEL, the defendant, and CW-1 discussed a purported $50,000 loan that MICHEL represented was being sought by CHUCK CONNORS PERSON, the defendant, in exchange for PERSON's agreement to use his influence over student-athletes at Auburn University to retain CW-1's financial advisory services. During this time, MICHEL and CW-1 also discussed how the purported "loan" would be "offset" by PERSON for each student-athlete that PERSON directed to retain CW-1's services.

24. RASHAN MICHEL, the defendant, devised a method to conceal the true nature of their bribery scheme with CHUCK CONNORS PERSON, the defendant, through a sham promissory note for the purported loan — when in truth and in fact there was no expectation

10

that PERSON would ever repay the loan so long as PERSON was able to steer student-athletes under his control to CW-1 and MICHEL — so that, according to MICHEL, the transaction would appear "clean" and would not "hurt" PERSON.

25. On or about November 29, 2016, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, met with CW-1 at a restaurant located in the vicinity of Auburn University's campus. During the meeting, PERSON agreed to accept $50,000 in bribe payments from CW-1 in exchange for using his official position at Auburn University to steer student-athletes on Auburn University's men's basketball team to CW-1's financial advisory and business management services. At the end of the meeting, CW-1 paid PERSON $5,000 in cash. PERSON, MICHEL and CW-1 also agreed that PERSON would receive the balance of the bribe payment in three $15,000 increments, payable on the 15th of each month.

26. The next day, on or about November 30, 2016, CHUCK CONNORS PERSON, the defendant, spoke by telephone to CW-1 about a specific student-athlete ("Player-1") that PERSON wanted to steer to CW-1, and told CW-1 that Player-1 was likely to enter the NBA draft following the current season. PERSON informed CW-1 that Player-1 "listens to one person. He listens to one person . . . That's me, yep." On the same call, PERSON also asked CW-1 to confirm that he would be receiving the next installment of the

11

bribe payment on the agreed-upon schedule.

27. On or about December 1, 2016, CW-1 wired $5,000 to a bank account controlled by CHUCK CONNORS PERSON, the defendant, at PERSON's request.

### *PERSON Introduces MICHEL and CW-1 to Student-Athletes and Their Families For the Purpose of Influencing the Athletes to Retain CW-1 and MICHEL*

28. On or about December 12, 2016, CHUCK CONNORS PERSON, the defendant, arranged for CW-1 and RASHAN MICHEL, the defendant, to meet with Player-1 in a hotel room in Manhattan, New York, while Auburn University was in town for a basketball game. During that meeting, PERSON introduced CW-1 to Player-1 as a financial advisor with the ability to help Player-1 once he entered the NBA, and introduced MICHEL as someone from whom Player-1 could obtain custom clothing. PERSON also informed Player-1 that he could speak to CW-1 on a separate telephone, which CW-1 would provide to Player-1. At the conclusion of that meeting, PERSON accepted approximately $15,000 dollars in cash from CW-1 outside of the presence of Player-1.

29. On or about December 17, 2016, CHUCK CONNORS PERSON, the defendant, informed Player-1's mother ("Mother-1") that Player-1 should leave Auburn University soon to play for the NBA. PERSON also urged Mother-1 to retain CW-1's services for Player-1, and falsely told Mother-1 that CW-1 represented PERSON and another

12

well-known NBA player, in order to pressure and influence Mother-1 into retaining CW-1.  PERSON further told Mother-1 that CW-1 would help Mother-1 financially while Player-1 was still in college.

30.  The next day, on or about December 18, 2016, CHUCK CONNORS PERSON, the defendant, introduced CW-1 to Mother-1 and a male believed to be the athlete's stepfather ("Stepfather-1") at PERSON's home in Alabama.  During that meeting, PERSON again vouched for CW-1's abilities as a financial advisor and urged Mother-1 and Stepfather-1 to retain the services of CW-1 for their son.  PERSON also informed Player-1's family members that CW-1 would make a cash payment of approximately $1,000 to them that day, which CW-1 provided at the meeting.

31.  On or about January 18, 2017, CHUCK CONNORS PERSON, the defendant, arranged a similar meeting between CW-1, another student-athlete on the men's basketball team at Auburn University ("Player-2") and Player-2's mother ("Mother-2") at PERSON's home in Alabama.  During that meeting, PERSON introduced CW-1 as someone who would be one of Player-2's business managers and financial advisors.  PERSON also told Mother-2 that CW-1 would be able to help Mother-2 financially while Player-2 was still in college.  At the conclusion of the meeting, outside of the presence of Player-2 and Mother-2, CW-1 provided PERSON with approximately

13

$10,000 dollars in cash.

32.  In exchange for the bribe payments, CHUCK CONNORS PERSON, the defendant, also used his influence to pressure Mother-2 to commit to retain CW-1's services for Player-2, and advised Mother-2 that she should request and accept payments from CW-1 until Player-2 left Auburn University.  During a telephone call on January 23, 2017, PERSON told Mother-2 that Mother-2 would be committing to retaining CW-1 for Player-2 by taking money from CW-1, and Mother-2 thanked PERSON for "putting the right people around us."

33.  Between in or about January 2017, and in or about July of 2017, CHUCK CONNORS PERSON, the defendant, continued to accept bribe payments from CW-1, including via wire transfer.

### COUNT ONE
### (Conspiracy To Commit Bribery)

The Grand Jury charges:

34.  The allegations set forth in paragraphs 1 through 33 of this Indictment are repeated and realleged as if fully set forth herein.

35.  From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and

14

knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

36.    It was a part and object of the conspiracy that CHUCK CONNORS PERSON, the defendant, being an agent of an organization that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, Auburn University, corruptly would and did solicit and demand for the benefit of a person, and accept and agree to accept, something of value from CW-1, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization, involving something of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

37.    It was further a part and an object of the conspiracy that RASHAN MICHEL, the defendant, and others known and unknown, corruptly would and did give, offer, and agree to give something of value to a person, with intent to influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt

15

of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2).

## Overt Acts

38. In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about November 29, 2016, in Alabama, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and CW-1 met, during which meeting PERSON agreed to accept approximately $50,000 in bribe payments from CW-1 in exchange for using his official position at Auburn University to steer student-athletes on Auburn University's NCAA Division I men's basketball team to retain the services of CW-1 and MICHEL.

b. On or about December 12, 2016, in Manhattan, New York, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, met with CW-1 and a current student-athlete on Auburn University's NCAA Division I men's basketball team and together discussed, in sum and substance, that the athlete would retain the services of MICHEL and CW-1 upon becoming a professional basketball player.

c. Immediately after the December 12, 2016 meeting, in Manhattan, PERSON took from CW-1 a $15,000 cash bribe.

16

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Solicitation Of Bribes And Gratuities By An Agent Of A**
**Federally Funded Organization – CHUCK CONNORS PERSON)**

The Grand Jury further charges:

39.     The allegations set forth in paragraphs 1 through 33 of this Indictment are repeated and realleged as if fully set forth herein.

40.     From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON, the defendant, being an agent of an organization that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, Auburn University, aided and abetted by RASHAN MICHEL, the defendant, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization involving a thing of value of $5,000 and more, to wit, PERSON, in his capacity as a coach for the NCAA Division I men's basketball team at Auburn University, solicited and accepted cash and things of value from CW-1, as brokered by MICHEL, which were intended to influence and reward

17

PERSON in connection with the business of Auburn University.

(Title 18, United States Code, Section 666(a)(1)(B) and 2.)

## COUNT THREE
## (Conspiracy To Commit Honest Services Wire Fraud)

The Grand Jury further charges:

41.  The allegations set forth in paragraphs 1 through 33 of this Indictment are repeated and realleged as if fully set forth herein.

42.  From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

43.  It was a part and an object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive Auburn University of its intangible right to PERSON's honest services, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing

18

such scheme and artifice, in violation of Title 18, United States
Code, Sections 1343 and 1346, to wit, PERSON, through telephone
and email communications, and wire transfers of funds, among other
means and methods, agreed to and did deprive Auburn University of
PERSON's honest services by soliciting and receiving bribes, some
of which were facilitated by MICHEL, in exchange for which PERSON
agreed to and did exercise his influence as a coach at Auburn
University to persuade and pressure student-athletes to retain the
services of CW-1.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Honest Services Wire Fraud)

The Grand Jury further charges:

44.   The allegations set forth in paragraphs 1 through 33 of
this Indictment are repeated and realleged as if fully set forth
herein.

45.   From at least in or about September 2016, up to and
including in or about September 2017, in the Southern District of
New York and elsewhere, CHUCK CONNORS PERSON, the defendant, aided
and abetted by RASHAN MICHEL, the defendant, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and to deprive Auburn University of its
intangible rights to PERSON's honest services, and attempting to

19

do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, PERSON, through telephone and email communications, and wire transfers of funds, among other means, agreed to and did deprive Auburn University of his honest services by soliciting and receiving bribes, some of which were facilitated by MICHEL, in exchange for which PERSON agreed to and did exercise his influence as a coach at Auburn University to persuade and pressure student-athletes to retain the services of CW-1.

(Title 18, United States Code, Section 1343, 1346, 1349, and 2.)

## COUNT FIVE
## (Wire Fraud Conspiracy)

The Grand Jury further charges:

46. The allegations set forth in paragraphs 1 through 33 of this Indictment are repeated and realleged as if fully set forth herein.

47. From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and

20

knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

48. It was a part and object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, PERSON and MICHEL, and others known and unknown, participated in a scheme to defraud Auburn University by facilitating and concealing bribe payments to student-athletes at Auburn University, and/or their families, including by telephone and email communications, and wire transfers of funds, among other means, thereby causing Auburn University to continue to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the bribe payments.

49. It was a further part and object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others

21

known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, PERSON and MICHEL, and others known and unknown, participated in a scheme to defraud Auburn University by making and concealing bribe payments to current student-athletes at Auburn University, and/or their families, including by telephone and email communications, and wire transfers of funds, among other means, which deprived Auburn University of the right to control the use of its assets, including the decision of how to allocate a limited number of athletic scholarships, and which, if revealed, would have further exposed Auburn University to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Section 1349.)

22

## COUNT SIX
### (Travel Act Conspiracy)

The Grand Jury further charges:

50. The allegations set forth in paragraphs 1 through 33 of this Indictment are repeated and realleged as if fully set forth herein.

51. From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

52. It was a part and object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, as part of MICHEL offering, and PERSON accepting commercial bribes, in violation of Alabama Criminal Code §§ 13A-11-120 and

23

13A-11-121, MICHEL and PERSON thereafter would and did perform and attempt to perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

## Overt Acts

53. In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about November 29, 2016, in Alabama, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and CW-1 met, during which meeting PERSON agreed to accept approximately $50,000 in bribe payments from CW-1 in exchange for using his official position at Auburn University to steer student-athletes on Auburn University's NCAA Division I men's basketball team to retain the services of CW-1 and MICHEL.

b. On or about December 12, 2016, in Manhattan, New York, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, met with CW-1 and a current student-athlete on Auburn University's NCAA Division I men's basketball team and together discussed, in sum and substance, that the athlete would retain the services of MICHEL and CW-1 upon becoming a professional basketball player.

24

c. Immediately after the December 12, 2016 meeting, in Manhattan, PERSON took from CW-1 a $15,000 cash bribe.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

54. As a result of committing the offenses charged in Counts One through Six of this Indictment, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## Substitute Asset Provision

If any of the above described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

25

(d) has been substantially diminished in value; or

(e) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p) and Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

> (Title 18, United States Code, Section 981,
> Title 21, United States Code, Section 853, and
> Title 28, United States Code, Section 2461.)

FOREPERSON

November 7, 2017

JOON H. KIM
Acting United States Attorney

26

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**CHUCK CONNORS PERSON, and
RASHAN MICHEL**

**Defendants.**

**INDICTMENT**

17 Cr.

(18 U.S.C. §§ 371, 666, 1343, 1346,
1349, and 2.)

JOON H. KIM
Acting United States Attorney.

**A TRUE BILL**

Foreperson.

November 7, 2017

11/7/17 - Filed Indictment.
ac      Case assigned to J Preska

J Preska
USMJ